# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| PBS&J Constructors, Inc. | ) ASBCA Nos. 57814, 57964 |
| | ) |
| Under Contract No. W9126G-09-C-0016 | ) |

APPEARANCE FOR THE APPELLANT:    John S. Vento, Esq.
                                 Trenam Kemker
                                 Tampa, FL

APPEARANCES FOR THE GOVERNMENT:  Thomas H. Gourlay, Jr., Esq.
                                 Engineer Chief Trial Attorney
                                 Charles L. Webster III, Esq.
                                 Engineer Trial Attorney
                                 U.S. Army Engineer District, Fort Worth

## OPINION BY ADMINISTRATIVE JUDGE SCOTT

PBS&J Constructors, Inc. (PBS&JC) appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) denial of its $494,962 Type I differing site conditions claim under its contract awarded by the U.S. Army Corps of Engineers (Corps) for the design and construction of the Whole Barracks Renewal Complex, Fort Hood, Texas (ASBCA No. 57814), and from the CO's denial of its $368,063 claim due to the Corps' alleged unwarranted refusal to allow it to use shallow foundations in certain areas (balcony piers claim) (ASBCA No. 57964). The Board consolidated the appeals and held a four-day hearing in Fort Worth, Texas. We decide entitlement only. For the reasons stated below, we deny the appeals.

## DIFFERING SITE CONDITIONS CLAIM – ASBCA No. 57814

### FINDINGS OF FACT

1. On 5 August 2008 the Corps issued a request for proposals (RFP) for the subject firm-fixed-price contract for a design/build barracks project (R4, tab 3)[1] The RFP included the Corps' August 2007 geotechnical report (GTR). PBS&JC submitted a proposal on 24 October 2008 (R4, tabs 15A, 15B; *see also* R4, tab 3 at 1 of 39; tr. 1/34).

---

[1]  Unless otherwise noted, "R4" refers to the Rule 4 file and the Corps' supplemental Rule 4 file in ASBCA No. 57814. Some of those documents, e.g., the contract, also apply to ASBCA No. 57964.

The Corps awarded it the contract on 27 February 2009, in the amount of $32,373,000. It incorporated the RFP and GTR. (R4, tab 3 at 2, 18 of 39, § 1.2., at 209 of 796)

2. PBS&JC was a sister company to Peter Brown Construction (Brown). Atkins North America, Inc. (Atkins), the parent company, had design responsibility. PBS&JC began doing business as Brown at project start.[2] Kleinfelder Central (Kleinfelder) was Brown's geotechnical engineer and Alliance Geotechnical Group of Austin, Inc., (Alliance) was its geotechnical inspector. Alliance prepared daily activity observation reports and pier inspection reports. (R4, tabs 7B, 7C at Bates 259-394; tr. 1/36-38, 2/135)

3. The RFP incorporated the Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) clause by reference, which provides concerning Type I differing site conditions that the contractor is promptly to notify the CO of "subsurface or latent physical conditions at the site which differ materially from those indicated" in the contract. If the conditions do differ materially and increase the contractor's cost or time in performing any part of the contract work, an equitable adjustment is to be made. The RFP also incorporated by reference the FAR 52.243-4, CHANGES (JUN 2007) clause. (R4, tab 3 at 6 of 39)

4. For potential time extensions, the RFP included anticipated adverse weather delays, including four days each in January through June, September and October, and December, and three days each in July, August and November (R4, tab 3 at 2-3 of 11).

5. The RFP required at § 01 10 00, Statement of Work (SOW), that the contractor have a licensed geotechnical engineer interpret the GTR and develop earthwork and foundation recommendations and design parameters and that:

> If any additional subsurface investigation or laboratory
> analysis is required to better characterize the site or develop
> the final design, the Contractor shall perform it under the
> direction of a licensed geotechnical engineer....If differences
> between the Contractor's additional subsurface investigation
> and the government provided soils report or the reasonably
> expected conditions require material revisions in the design,
> an equitable adjustment may be made, in accordance with the
> provisions of the Differing Site Conditions clause.

(R4, tab 3 at 31 of 796, ¶ 5.2.2.1.) The engineer was to prepare a final geotechnical evaluation report, to be part of the contractor's first foundation design submittal (R4, tab 3 at 31 of 796, ¶ 5.2.2.2., at 108 of 796, § 01 33 16, Design After Award, ¶ 3.5.3.).

---

[2] Like the parties, we usually refer to appellant PBS&JC for convenience.

6. The GTR included boring logs, noting that the 19 test holes were drilled in December 2003 and January 2004, for another project at the site that did not materialize. The logs identified the nature of the subgrade material through which the test bore was drilled; the test bore's depth; whether the subgrade material caved in or blocked the test bore; and whether water was present. Ten of the borings were drilled to depths from 21 to 49 feet; nine were drilled from 3 to 10½ feet, referred to by the Corps, although not in the GTR, as the "deep" and "shallow" borings, respectively. The shallow borings had the prefix "10A," Fort Worth's traditional designation for pavement borings. (R4, tab 3 at 209 of 796, tab 4 at Bates 2-3, 28-31; tr. 3/231, 241-42) The 19 borings were drilled across a site of over 12.4 acres, of which the barracks footprint was about 1.5 acres (tr. 1/49-50; Corps 12/19/12 resp. to app's proposed fact findings (APFF) in ASBCA No. 57814 (Corps dsc resp.) at 7, ¶ 18). The project called for more than 540 drilled piers, each with an anticipated depth of 32 feet (R4, tab 4 at Bates 12; tr. 2/99, 3/231).

7. The GTR stated:

> Groundwater conditions were monitored during drilling operations, immediately upon completion of the test holes, and after 18-hour and 24-hour observation periods. Static water levels were measured in six of the nineteen borings...with depths ranging from 11.8 feet to 28.5 feet below existing grade. The remaining test holes were dry or blocked.

(R4, tab 4 at Bates 3) Static water levels in the six borings were reported as follows:

| Boring | Static Level, feet |
| --- | --- |
| 3ST-5440 | 21.5 |
| 8A4C-5445 | 28.5 |
| 8A-5446 | 11.8 |
| 3ST-5447 | 15.2 |
| 8A4C-5450 | 18.0 |
| 8A-5454 | 13.2 |

(*Id.*) The list did not include boring 8A4C-5443, which the log described as "DRY" but which showed water present (finding 9).

3

8. The GTR continued:

> Subsurface conditions representative of the project site are shown on the boring logs....actual subsurface conditions in areas not sampled may differ from those predicted. The nature and extent of variations across the sites may not become evident until construction commences, and the actual construction process may alter subsurface conditions as well. If variations become evident at the time of construction, [the Corps] should be contacted to determine if the recommendations presented in this report need to be reevaluated.

(R4, tab 4 at Bates 6)

> These discussions are provided to the Design-Build Contractor to develop his foundation and pavement designs....It should be noted that the discussions presented herein are based on the results of the Government geotechnical field investigation and laboratory testing program, engineering studies, and previous engineering experience with similar structures at Fort Hood. The Design-Build Contractor should consider the information provided in this report and comply with the requirements and recommendations presented herein when developing his foundation and pavement designs. The Design-Build Contractor may use the subsurface boring log and lab testing data presented herein as the sole basis to formulate his foundation and pavement designs, or, at his option, the Design-Build Contractor may supplement the information provided herein by his own geotechnical field investigations and laboratory testing program.

(*Id.* at Bates 9)

> Groundwater should be anticipated during pier construction. Therefore, the drilling contractor shall be required to have temporary steel casing and pumps at the job site prior to construction of the drilled piers.

(*Id.* at Bates 13)

4

9. Regarding the six borings within the building's footprint (*see* R4, tab 2 at 9), the boring logs, § 15, "ELEVATION GROUND WATER," stated:

| | |
|---|---|
| 8A4C-5443 | DRY |
| 8A-5446 | AT 11.8' IMMEDIATELY |
| 8A4C-5445 | 24 HR. CHECK - 28.5' |
| 3ST-5447 | AT 15.2' |
| 8A-5448 | DRY BLOCKED at 18' |
| 8A4C-5450 | SEE BELOW [showing "WATER LEVEL" at 24 hour check at 18.0' and open to 33'] |

(R4, tab 4 at Bates 29-30, Sheets B201, B202) For boring 5443, which came within the building's footprint when PBS&JC added exterior walkways and balconies to its design (tr. 1/57, 60; finding 54), despite the "DRY" note in § 15, the log described the "WATER LEVEL" at the 24 hour check as at 13.5' and the hole as "BLOCKED" at 21.0' (R4, tab 4 at Bates 29, Sheet B201). Although boring 5448 showed no static water level, and indicated "DRY" in § 15, it also described the soil as "slightly moist" and "very moist" (*id.* at Bates 30, Sheet B202). For boring 5450, the log indicated that there was no sloughing above 30' (R4, tab 4 at Bates 30, Sheet B202; Corps dsc resp. at 21-22, ¶ 44).

10. PBS&JC admits groundwater was detected from 11.8' to 28.5' but contends that the water at 11.8' was not an intrusion but "perched" water (app. 1/28/13 dsc. resp. to Corps 12/19/12 dsc br. (app. dsc resp.) at 9, ¶ 24). Wayne A. Eddins, Alliance's project manager (tr. 2/29-30), who was not an expert witness, described perched water as:

> [U]sually...when you've got a zone of clay and water migrates down and just sits right there. It [doesn't] go any further and it doesn't come anywhere else. It just kind of got to that layer and stopped until it evaporates or migrates horizontally.
>
> ....
>
> ...[P]retty much a perched water table is something that's seasonal, based on rainfalls.

(Tr. 2/120-21) He described "static water" as water that "reached a certain level within the boring and it stopped" (tr. 2/54). He opined that perched water in a boring does not indicate that casing will be required (tr. 2/121). Mr. Eddins confirmed that the GTR and borings did not discuss the quantity of water or provide any information concerning the type of water flow a contractor could expect to encounter (tr. 2/83).

11. PBS&JC understood that, under the Corps' technical regulations, no more than three inches of water could accumulate in a pier hole prior to the placement of concrete (tr. 2/50-51, 3/235; *see* R4, tab 7B at Bates 166-222 ("Less than three inches of water was present at the time of concrete placement."); *see also* tr. 2/20-21). Temporary casing keeps the drilled pier hole dry and maintains the integrity of its sidewalls, allowing concrete placement (*see* R4, tab 7C at Bates 224-27; app. dsc resp. at 17, ¶ 40).

12. Joseph A. Williams became PBS&JC's senior project manager in February 2010 (tr. 1/33-34), about a year after contract award. On 24 February 2010 the Corps' Administrative Contracting Officer (ACO) and Resident Engineer, Harvey B. Hammer, rejected PBS&JC's geotechnical report as unsatisfactory (R4, tab 23; tr. 3/265-66).

13. PBS&JC submitted to the Corps a design analysis dated 2 June 2010 by Bryan Rose, a licensed geotechnical engineer and Kleinfelder's principal project representative. PBS&JC ultimately did not proffer Mr. Rose as an expert witness. The parties agree that PBS&JC used the analysis, based upon the Corps' data, to estimate soils' potential vertical movement and consolidation, foundations' bearing capacities, and construction considerations, including deep foundations. (ASBCA No. 57964 (57964) R4, tab 9 at 35, 58, 60-61; tr. 1/37, 2/253-54, 256, 3/48-49; Corps dsc resp. at 48, ¶ 131) Regarding the GTR, the analysis stated at § 2.4, Subsurface Water:

> [G]roundwater levels were monitored during drilling, immediately upon completion of each boring, and after 18-hour and 24-hour observation periods. Static water levels were observed in 6 of 19 borings at depths of 11.8 to 28.5 feet below existing grade. The remaining borings were noted to be dry or blocked at the time of measurement.
>
> These short-term field observations generally do not permit an accurate evaluation of subsurface water levels at this location and should not be interpreted as a groundwater study. It should be noted that the observations made within the [GTR] may not represent conditions at the time of construction and the presence of groundwater may affect certain construction activities and long-term performance of the foundations. The quantity of transient water is variable and is dependent on climatic conditions before and during construction. The foundation contractor should check the subsurface water conditions just prior to foundation excavation activities.

6

(57964 R4, tab 9 at 66) It stated at § 4.4 Drilled Pier Foundation Construction Criteria:

> 7. Zones of sloughing soils or groundwater may be
>    encountered within the soil, which could cause
>    sloughing of pier sidewalls to occur. Thus, we
>    recommend that provisions be incorporated into the
>    plans and specifications to utilize temporary steel casing
>    to control sloughing and/or groundwater during pier
>    construction should it occur.

(57964 R4, tab 9 at 82)

14. According to Mr. Rose, bore hole collapse or blockage causes include water, drilling, excavation, and loose soils. Water and blockage indicate a potential, but not definite, casing need. What governs casing is the relative stability of the borehole sidewalls, and the volume of water and rate at which it is encountered. Water in the GTR's borings did not communicate that casings had to be used because the logs did not provide enough information to ascertain its volume or flow rate. Mr. Rose was not suggesting that the logs were deficient. He opined that they were largely consistent with the applicable geotechnical standard of care. (Tr. 2/266-67, 3/12, 19-20, 78, 97)

15. Per Mr. Rose, borings within a building's footprint are considered first and are the most relevant regarding materials to be encountered, but proximity is less important where water is concerned. Adjacent borings and any in the project's vicinity are relevant because water moves regionally through the project site. (Tr. 3/6, 29-31, 80-82, 90) All water shown in a boring log is relevant:

> All water is relevant, whether it be a static groundwater level
> table, a perched condition with sufficient quantity, even
> though it's not static--it's a transient or temporary condition--
> could, when drilling through it, infiltrate into the pier hole and
> adversely affect construction and requir[e] casing.

(Tr. 3/83) However, he opined that, while borings might alert a contractor to the possibility of encountering water during construction, they do not provide enough information to ascertain how much will be encountered (tr. 3/7, 79).

16. Mr. Rose, who was experienced with the subsurface conditions at Fort Hood and its vicinity, found the conditions disclosed in the GTR to be generally consistent with the two or three previous reports he had done at Fort Hood and with the geological profile

one would expect in that region. Kleinfelder did not see anything indicating that it might need to do a supplemental investigation. (Tr. 2/260, 262-63)

17. According to Ronald Harris, the Corps' supervisor of materials quality assurance testing at Fort Hood, if a drill hole is blocked, it indicates that the sidewall has been compromised and, in 99% of the cases, water is involved, usually the reason for the blockage. He found that every project boring hole from 20-40' showed water, blockage, or both. In a 1 July 2010 preparatory meeting with PBS&JC and subcontractors on drilled piers he advised that they needed casing on site for each anticipated diameter size hole so they would be ready. (Tr. 3/205, 211-14, 216-17, 233)

18. The parties agree that PBS&JC began drilling and pouring concrete piers on about 11 August 2010. Its project superintendent, Ron Hartshorn, arrived on site in late August 2010. (R4, tabs 7B, 7C at Bates 226, 395; tr. 1/37, 3/115, 118; app. dsc resp. at 17, ¶ 42; app. 1/28/13 balcony piers reply (app. bp reply) at 17, ¶ 89).

19. On 7-8 September 2010 a severe storm occurred. PBS&JC's Quality Control Reports (QCRs) referred to "extreme weather conditions" (R4, tab 12 at 605, 607), and recorded a total of 8.25" of rain on the project site (*id.* at 604-05). Mr. Williams described it as a "tropic storm" like "a one-in-50-year event" (tr. 1/78). He believed that, in connection with compaction problems he attributed to a prior contractor, the heavy rainfall in a short period created unsuitable material that directly related to the amount of water encountered during drilling. He thought that the effect on the subgrade material could have resulted in a French drain that impacted 305 drill holes that had immediate water and were cased and another 239 that were cased although no water was visible at first (*see* finding 20). Only four holes did not contain water. (R4, tab 12 at Bates 604-05; app. 2nd consol. supp. R4, tab A-021 at 1; tr. 1/63-64, 68, 70-74, 78-79, 175; Corps dsc resp. at 7, ¶ 17)

20. Most often when drilling began water would start coming in the pier sidewalls at differing rates and elevations. In the 305 holes where water was present, casing was required because it was coming in "so fast" according to Alliance's Mr. Eddins (tr. 2/49). In the 239 holes where no water was present initially, after one to five hours, there were saturated soils and sidewalls and water at the bottom of the pier that could not be pumped down to an acceptable level. Terry Herzog, of Herzog Foundation Drilling (Herzog), a subcontractor to PBS&JC's subcontractor Gibson Concrete (Gibson), was the project's drilling superintendent. Herzog pumped out the holes the first day or so but thereafter did not try pumping because "the water was coming in too fast and caving off the sides" according to Mr. Herzog (tr. 2/9). Herb Morgan, the Corps' quality assurance inspector, recommended that even the holes that initially did not contain water be cased. PBS&JC, Gibson, Alliance and Herzog all concurred. PBS&JC ultimately had to case most of the pier holes because of significant groundwater intrusion, unstable subgrade materials, or

8

both. (Tr. 1/43-44, 66-67, 2/5-10, 24-26, 44-45, 49-51; app. dsc resp. at 18, ¶ 44; *see also* R4, tab 7C at Bates 395-96)

21. PBS&JC's QCRs mentioned groundwater at times (R4, tab 12 at Bates 543, 546, 548, 553, 556, 558, 560, 563, 566, 569, 572, 574, 577, 580, 583, 587, 589, 592, 595, 598). Gibson's daily reports, under "PROBLEMS/UNUSUAL CONDITIONS," mention water or casing on 12, 13, 17 and 18 August 2010 but do not mention groundwater concerning pier drilling thereafter, through 16 November 2010 (R4, tab 7A at Bates 62, 63, 65-130). Alliance's daily reports for 13 August 2010 through 16 November 2010 regularly state that "groundwater infiltration was observed" in the piers being drilled (*e.g.*, R4, tab 7B at Bates 162, 222). They do not mention the amount, the infiltration rate, or the elevation at which water was encountered. None of these documents characterize the groundwater as immediate, massive or continuous.

22. By letter of 11 January 2011 to the Corps' project engineer, Andy Heinchon, PBS&JC submitted a $494,962 request for equitable adjustment (REA) alleging a Type I differing site condition regarding the drilled piers. It did not request more time. By letter of 28 January 2011 to ACO Hammer, it converted its REA into a CDA claim, which it certified on 4 February 2011. (R4, tab 7C at Bates 224, 227-28, tabs 8, 10; tr. 4/86)

23. According to PBS&JC's claim, the GTR and RFP "clearly state that a deep foundation system will be required" and the GTR, "while limited," provided 19 borings to depths of up to 49' (R4, tab 7C at Bates 224). The GTR indicated that ground water was in 6 of the 19 borings, from 11.8' to 28.5', and "it was reasonable to infer that groundwater was present to some extent" (*id.*). Nine of the borings were "within the consideration limits for the proposed building location" and they were evaluated (*id.* at Bates 225). Those were 10A-5442, 8A4C-5443, 10A-5444, 8A4C-5445, 8A-5446, 3ST-5447, 8A-5448, 10A-5449, and 8A4C-5450 (tr. 1/118). PBS&JC alleged that, while there was groundwater in four of the nine borings, this did not indicate that measures beyond pumping would be required. Further study to determine the type of material at the groundwater's depth was needed. Conditions affecting drilling included "quality of material..., cave-in considerations, dynamic versus static pressure of groundwater..., season of borings, and condition of groundwater (perched or aquifer)" (R4, tab 7C at Bates 225). The borings were in December 2003 and January 2004, which PBS&JC alleged to be two of the wettest months and considered the groundwater conditions encountered then to be a "worst case scenario" (*id.*).

24. The claim alleged that, based upon the RFP, "it was concluded that casing would be required at a ratio of 2 holes per 9 drilled, or 22.2% of the drilled pier locations" (R4, tab 7C at Bates 225). It alleged that, while PBS&JC had made a 22% pier casing estimate, starting on 16 August 2010, casings in all piers were required due

9

to groundwater levels and apparent instability of the shaft walls at depth. While the 2 June 2010 Kleinfelder report had discussed potential groundwater and made recommendations should temporary casing be required, "no extraordinary geological conditions were noted or implied...that would have changed [PBS&JC's] assumptions at bid time" (*id.* at Bates 226). It developed that PBS&JC had to case 97% of the drill holes (tr. 1/45).

25. The claim included what PBS&JC described as its "notes relative to the evaluated borings" upon which it relies in support of its alleged pre-proposal 22% casing estimate (R4, tab 7C at Bates 225). The handwritten notes are undated, unsigned and anonymous (*id.* at Bates 256-57). Mr. Williams, who authored and signed the REA, speculated that they were from its preconstruction department, which put its proposal together, but he was not involved in the casing estimate, could not recall any communications with its creator(s), and did not know who had arrived at the estimate or when (tr. 1/46, 117, 119-22, 201-02). He acknowledged:

> Again, that would be a question probably better, I guess, asked of our preconstruction department. I mean, when I came on the project, per my previous testimony, was in February 2010, and the project was already awarded.

(Tr. 1/124)

26. The contractors on the project did not give Alliance or Mr. Eddins a project casing estimate and, prior to the hearing, he never saw the handwritten notations on the boring logs that PBS&JC contend were made by its preconstruction department in reaching a casing estimate (tr. 2/62-63, 95, 124).

27. Mr. Rose of Kleinfelder was never asked to provide any casing estimate and was not involved in any 22% casing estimate by the contractor (tr. 3/75, 79).

28. Although the annotations on the boring logs reflect a 22% casing estimate, they also note that "our driller assumed" that 30% of the drill holes would have to be cased, without identifying the driller or when the alleged assumption was made (R4, tab 7C at Bates 257). There is no evidence that any driller had been selected prior to PBS&JC's proposal. According to the project's drilling superintendent, Terry Herzog, it is normal and customary for the driller and the concrete subcontractor to bring casings and pumps to a project in case of groundwater. He was not involved with any pier casing estimate for the project. His father took care of Herzog's bid estimates. Terry Herzog was unaware of any 30% casing estimate. He never saw the boring logs. He did not know PBS&JC's senior project manager Williams. (Tr. 2/16-18, 22, 24-25)

29. Without explanation, PBS&JC did not call anyone to testify who was involved in reaching the alleged 22% estimate. There is no contemporaneous evidence that the notes were prepared pre-proposal or of PBS&JC's pre-proposal assumptions concerning site conditions. Thus, we find that PBS&JC has not substantiated its claim that it reasonably interpreted and relied upon the GTR and boring logs, and arrived at a 22.2% casing estimate, prior to its submission of its proposal to the Corps.

30. The claim alleged that an attached Alliance letter supported PBS&JC's "pre-proposal assumptions" (R4, tab 7C at Bates 226). The claim appears to have included two Alliance letters on geotechnical and differing site conditions issues (findings 31, 32), but, ultimately, PBS&JC did not proffer anyone from Alliance as an expert witness (tr. 2/31-32). As with Kleinfelder's various reports, we have considered Alliance's letters but do not deem them to be expert opinions.

31. A 21 December 2010 letter to Mr. Williams from Mr. Eddins, prepared by Alliance's project engineer, pertained to geotechnical conditions during the drilled pier installation, based upon Alliance's review of the RFP, GTR and boring logs and interviews with its inspectors. Alliance stated, *inter alia*, that only 2 of the GTR's 19 borings were within the structure's footprint, of which only 1 documented groundwater and that, based upon the GTR, about 31% of the borings indicated water. However, in most cases, temporary casing was necessary to stem the water flow and/or prevent further sidewall sloughing and to limit water accumulation to 3" or less. The stabilization effort began on about 23 August 2010. Mr. Eddins acknowledged at the hearing that two borings within the building's footprint contained water, not one. (R4, tab 7C at Bates 395-96; tr. 2/43, 52-53, 103-04)

32. The claim also included a 7 January 2011 letter to PBS&JC from Mr. Eddins, stating that there had been a differing site condition, based upon Alliance's review of the RFP, the GTR, the boring logs and the 2 June 2010 Kleinfelder report, and that:

> In our professional opinion, it is reasonable to assume that the anticipated subsurface conditions relating to groundwater issues and casing requirements were substantially different than those encountered during the installation of drilled piers for the project.
>
> The conditions described in the above referenced documents would lead to a reasonable expectation of encountering groundwater in less than [30%] of the drilled piers and even fewer indications of potential side-wall instability. Based upon the conditions encountered during the drilled pier operations, and as presented in the documentation generated

11

during the full-time observation and reporting of the operations, casing was required in over [90%] of the piers due to either excessive groundwater intrusion, side-wall instability and/or a combination of both conditions.

(R4, tab 7C at Bates 258)

33. PBS&JC alleged at the hearing and in briefing, but did not articulate in its claim, that a prior contractor's failures to compact soils after demolition and to remove debris were differing site conditions (*see* app. 11/5/12 initial post-hearing br. at 10-12, APFF 65-76; finding 19). However, Mr. Eddins acknowledged that he could not say that debris and soils that were not as dense as others affected drilling or caused or contributed to the water encountered. He confirmed that the soils at the lower depths were competent enough to pour a pier and were as represented in the GTR and that the subgrade materials were what the boring logs indicated. In his view, the water caused the soil to become incompetent. (Tr. 2/48-49, 85, 94)

34. Alliance had several Fort Hood projects involving pier installation. In a November 2010 geotechnical report for one of them, contractors were told to anticipate groundwater and to assume that about 100% of piers must be cased. In Mr. Eddins' view, if there is no direction about the number of piers to be cased, a contractor must arrive at a number but "you never know until you drill the hole" (tr. 2/58-59, 112). The record is unclear but he apparently believed that a 22%-38% casing estimate would have been reasonable for the subject project, based upon the GTR. (App. 2nd consol. supp. R4, tab A-018 at 19; tr. 2/57, 64-65, 74-76, 80, 82; app. dsc resp. at 30, ¶ 79)

35. Herzog had prior experience at Fort Hood. For example, it had drilled piers in 2007 or 2008 on another barracks project a few blocks away, on the same street as the subject project. Water was present, but it came in slowly and could be pumped. There was little caving. There was a requirement to have casings and pumps on that job, but no casings were used. (Tr. 2/11-12) Hitting groundwater on a drilling project and the use of casings was not unusual in Terry Herzog's experience. He had extensive experience with jobs that required casing and, at the time of the hearing, Herzog had "just started a job that has to be all cased" (tr. 2/24). However, the amount of groundwater on the subject project was unusual for him compared to his other jobs (tr. 2/14, 23-24).

36. According to Mr. Williams, a basis of PBS&JC's differing site conditions claim is that it encountered a "massive amount" of water during installation of deep pier foundations (tr. 1/35) and, for 305 of the drilled piers (*see* finding 19), there was a "steady and consistent" or "constant and immediate" flow, such that, as soon as holes were drilled, it was "clearly evident" that casings were required (tr. 1/56, 64-65, *see also* tr. 1/90, 160-61, 163, 169-70). However, he did not find the conditions encountered to be

12

different than shown in the boring logs. Rather, the logs did not quantify the amount of water to be encountered, its flow rate into the holes, how many casings or pumps would be required, how often the contractor would have to case or pump, or the number of holes that could be pumped versus the number that had to be cased (tr. 1/76-77, 208-09). Under cross-examination Mr. Williams testified:

> Q      Okay. And you testified, did you not, that this was somehow different, a different condition from that which was shown on the boring logs. Is that accurate?

> A      Well, I think what I said was the conditions that we faced and the amount of water that we encountered, there's no way to determine from the boring logs the quantity and magnitude of the water. There was water shown in the logs, yes, but there's no way to quantify how much water.

> Q      Okay. So the logs don't show the reader or indicate to the reader how quickly that water inflow occurred. Right? I mean, isn't that what you just – I thought that's what you just said, that the logs don't indicate the rate of inflow of groundwater. Is that accurate?

> A      Yes.

(Tr. 1/170)

37. The CO denied PBS&JC's differing site conditions claim by final decision dated 25 July 2011 and this timely appeal ensued (R4, tabs 1, 2).

38. The contract completion date was 31 October 2011. It was not completed on time. Final inspection was on about 8 December 2011. The Corps did not assess liquidated damages. (Tr. 4/143-44)

Corps' Expert Evidence on Differing Site Conditions Claim

39. Kenneth McCleskey, a registered professional geologist, with a Bachelor of Science degree in geology and a Master of Science degree in civil engineering, prepared the GTR in substantial part. As of the hearing, he was acting chief of the Corps' geotechnical engineering and design section at Fort Worth and had been acting chief of the geotechnical branch. He was offered and admitted without objection as an expert in the area of geotechnical engineering. He submitted an expert report dated 18 July 2012. (R4, tab 33; tr. 3/222-24, 228) We consider him to be a mixed fact and expert witness.

13

40. In his expert report Mr. McCleskey stated that, per PBS&JC's REA, in arriving at its claimed 22% pier casing estimate, it had considered groundwater and stability conditions in nine borings it deemed to be in the area of the new facility's construction. He noted that three of them were "10A" borings that had only been drilled to a depth of 10' in areas of proposed new pavement construction for the prior project and were not intended to be used for foundation design. Piers were to be founded at depths of 32'. Moreover, all other groundwater levels and instability noted in the borings were at depths exceeding 10'. Static groundwater levels between 11.8' and 28.5' below grade were measured in five of the six remaining borings. The sixth boring, 8A-5448, was blocked at 18', indicating unsuitable material, but in the comments on the boring log included in its claim, PBS&JC mistakenly stated that there was no cave-in. (R4, tab 4 at Bates 30, Sheet B202, tab 33 at 1-2; *see also* McCleskey expert testimony at tr. 3/231, 241-42 (10A borings drilled too short to be reasonably considered for foundation design)

41. In Mr. McCleskey's expert opinion, PBS&JC's analysis of the boring logs in its claim was not reasonable. It did not consider all of the deep borings, including those that were not in the building's footprint, but were close. All of the deep borings were consistent in terms of materials and subsurface conditions observed, including the presence and transmissibility of groundwater and the instability of subsurface materials indicated by blockage. (Tr. 3/240-41) He concluded in his expert report that, even considering only the borings PBS&JC used, its analysis was unreasonable:

> Hence all six of the borings considered by the PBS&JC casing analysis that were drilled to the requisite pier foundation depth demonstrated either the presence of groundwater, instability of subsurface materials, or both, which would reasonably indicate the potential need for casing which should have been accounted for in the contractor's bid. Therefore, even considering only the borings PBS&JC used in their casing requirement analysis, a determination that casing would be needed in only 22 percent of the piers appears to be inadequately and unreasonably low.
>
> ....
>
> The PBS&JC pier casing analysis did not include the four other deep (foundation investigation) borings drilled during the [Corps] geotechnical subsurface investigation...borings 8A-5438, 3ST-5440, 3ST-5452, and 8A-5454. These borings should also have been considered by PBS&JC in the subsurface information analysis due to their proximity [to] the

14

project site. Out of the ten total deep borings, groundwater was noted in seven of the borings, while the remaining three were dry; blockage at various depths was also noted in the majority of the deep borings, indicating the presence of unstable materials. It is therefore reasonable to assume that 100 percent of piers would require casing.

(R4, tab 33 at 2; *see also* tr. 3/236-38, 250, 256-57 (GTR's borings demonstrated materials' permeable nature and their ability to transmit groundwater because 7 of 10 of deep borings were determined to have transmitted water and 10 of 10 indicated either groundwater or unstable materials as reflected by blockages.))

42. Mr. McCleskey acknowledged that water's flow rate is potentially a factor in determining whether to case a pier. The GTR showed stable water levels, but the inflow rate could be variable. (Tr. 3/236)

43. In Mr. McCleskey's expert opinion, job site conditions during drilling were similar to those indentified in the GTR's site field investigation (tr. 3/263-64). However, in the nature of fact evidence, he responded to questioning by PBS&JC's counsel that site conditions "could have been drier, but they could have been much wetter, and as we all know now, they turned out to be much wetter at that time" (tr. 3/261). The questioning mixed references to conditions at the time of PBS&JC's proposal compared to when the borings were taken and changes from the time of the proposal to the time of construction (tr. 3/259-61). We infer, in logical context, that Mr. McCleskey was referring to conditions at the time of pier drilling.

44. Mr. McCleskey acknowledged that contractors were entitled to rely upon the GTR's boring logs. The Corps considered the GTR's information, including the number of borings drilled and the similarity of the subsurface conditions encountered, to be completely adequate for contractors' use in submitting their proposals. (Tr. 3/239, 250-51, 260-61, 263-64)

DISCUSSION

As PBS&JC describes it, the "crux" of its differing site condition claim is:

> *[T]he difference between the type of groundwater found in the borings, static water, and the immediate and continuous significant inflow of water which was discovered in the holes immediately upon drilling or shortly thereafter – a condition nowhere described in the [GTR].*

15

....

> *The groundwater was a differing site condition not because it*
> *was encountered in 97% of the holes, but because of the*
> *immediacy, rate of flow, and quantity of the groundwater that*
> *was encountered which resulted in 97% of the holes being*
> *cased rather than pumped.*

(App. dsc resp. at 30, ¶ 79, at 31, ¶ 81)

The Corps responds, *inter alia*, that there was no differing site condition and PBS&JC's alleged interpretation of the boring logs was unreasonable. The three sets of contemporaneous daily logs do not support its description of the crux of its claim. Further, PBS&JC has not met its burden to prove reliance because it did not produce any verifiable documentation that it evaluated the boring logs or considered the pier casing issue before it submitted its proposal and did not produce any witness who had first-hand knowledge of its alleged casing estimate, including who made it and when.

To establish a Type I differing site condition PBS&JC must prove that:

> (1) [T]he contract contained positive indications of the
> conditions at the site; (2) it reasonably interpreted and relied
> upon the indicated site conditions; (3) the conditions
> encountered were materially different from those indicated;
> (4) the conditions encountered were reasonably unforeseeable
> based upon all the information available at the time of
> bidding; and (5) its injury was caused solely by the differing
> site condition.

*Nova Group, Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,321. The Federal Circuit has addressed iterations of these criteria in *International Technology Corp. v. Winter*, 523 F.3d 1341, 1348-49 (Fed. Cir. 2008); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998); *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987); and *P.J. Maffei Building Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984). Borings are the most significant indication of subsurface conditions. *Nova Group*, 10-2 BCA ¶ 34,533 at 170,322.

Regarding factor (1), the GTR and boring logs contained positive indications of site conditions. The GTR warned that "[g]roundwater should be anticipated during pier construction" and required the drilling contractor to have temporary steel casing and pumps on-site prior to drilled pier construction (finding 8). It listed 6 of the 19 borings at static water levels beginning at 11.8' and stated that the rest were dry or blocked.

16

Alliance's Mr. Rose acknowledged that blockage causes include water and loose soils and that water and blockage indicate a potential casing need. There were six borings within the building's footprint, of which two, 8A4C-5443 and 8A-5448, were not on the static water level list. At the logs' elevation groundwater section, 8A4C-5443 was stated to be dry but the log elsewhere showed water at 13.5' and the hole as blocked at 21.0'. Boring 8A-5448 was indicated to be dry and showed no static water level, but the soil was described as slightly moist and very moist. (Findings 7, 9, 14)

PBS&JC claimed that the borings were taken in two of the wettest months, December 2003 and January 2004, and represented a "worst case scenario" for groundwater conditions (finding 23). However, the RFP did not distinguish those months and anticipated adverse weather in many other months as well (finding 4).

Concerning the reliance factor (2), the GTR provided, and the Corps acknowledges, that PBS&JC was entitled to rely upon the boring logs (findings 8, 44). However, the handwritten notes which PBS&JC cites for its alleged 22% pre-proposal casing estimate are undated, unsigned and anonymous. PBS&JC's senior project manager Williams speculated that they were from its preconstruction department, but he was not on the job until after contract award, was not involved in the casing estimate, could not recall any communications with its creator(s), and did not know who had arrived at the estimate or when. (Finding 25) Alliance was not given any casing estimate and, prior to the hearing, Mr. Eddins had never seen the notations on the boring logs (finding 26). Mr. Rose of Kleinfelder was not asked for any casing estimate and was not involved in PBS&JC's alleged estimate (finding 27). Drilling superintendent Herzog was not involved with any pier casing estimate for the project (finding 28).

PBS&JC did not explain why it did not call anyone to testify who was involved in reaching its alleged casing estimate, for which we draw some adverse inference. *See Maintenance Engineers*, ASBCA No. 52527, 01-2 BCA ¶ 31,472 at 155,387. There is no contemporaneous evidence that the notes were prepared pre-proposal or of PBS&JC's pre-proposal assumptions about site conditions. It did not substantiate its claim that it reasonably interpreted and relied upon the GTR and boring logs, and arrived at a 22% casing estimate, prior to its submission of its proposal to the Corps. (Finding 29)

Factor (3) requires a comparison of conditions encountered to those indicated in the contract and a determination of whether they were materially different. First, as we discussed under factor (1), the contract did indicate subsurface conditions. However, to prove a Type I differing site condition, PBS&JC must show that the contract contained some indication of the particular conditions at issue. As we have summarized:

> A Type I differing site condition claim is dependent on
> what is "indicated" in the contract. *Foster Constr. C.A. and*

17

> *Williams Bros. Co. v. United States*, 435 F.2d 873, 881 (Ct. Cl. 1970) ("On the one hand, a contract silent on subsurface conditions cannot support a changed conditions claim.... On the other hand, nothing beyond contract indications need be proven."). A contractor cannot be eligible for an equitable adjustment for Type 1 changed conditions unless the contract indicated what those conditions would supposedly be. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984); *S.T.G. Construction Co. v. United States*, 157 Ct. Cl. 409, 414 (1962).

*NDG Constructors*, ASBCA No. 57328, 12-2 BCA ¶ 35,138 at 172,503.

Mr. Eddins of Alliance acknowledged that that the soils at the lower depths were competent enough to pour a pier and were as represented in the GTR and that the subgrade materials were what the boring logs indicated. He believed that water caused the soil to become incompetent. (Finding 33) He also confirmed that the GTR and borings did not discuss the quantity of water or provide any information concerning the type of water flow a contractor could expect to encounter (finding 10).

Ironically, as suggested in its description of the crux of its claim, which focused upon the rate of inflow of water, PBS&JC principally complains about the contract's alleged lack of site condition indications rather than incorrect indications or changes in the conditions (findings 10, 14, 15, 36). PBS&JC's counsel stressed this point in his opening statement:

> The [GTR] does not describe the water levels. It does not state how many casings the contractor must be prepared to use. It doesn't state the quantity or the flow rate [of] water, and it doesn't discuss anything with respect to expected infiltration into the site. None of that is in the [GTR].

(Tr. 1/15-16)

Regardless, Mr. McCleskey admitted that conditions were "much wetter" than they were when the borings were taken. We inferred that "much wetter" meant at the time of pier drilling. (Finding 43) Nevertheless, this alone does not trigger application of the differing site conditions clause. PBS&JC itself suggested that the cause of the additional water could be extreme weather. Drilling began on about 11 August 2010 and PBS&JC began to encounter water relatively soon thereafter that pumping did not resolve (findings 18, 20), but Mr. Williams believed that a severe storm on 7-8 September 2010, in connection with compaction problems he attributed to a prior contractor, created

18

unsuitable material that directly related to the amount of water encountered during drilling (finding 19)  However, "weather occurring during contract performance, no matter how severe, and other acts of God alone do not fall within the provisions of the Differing Site Conditions...clause." *Commercial Contractors Equipment, Inc.*, ASBCA No. 52930 *et al.*, 03-2 BCA ¶ 32,381 at 160,255.  Moreover, the differing site conditions clause protects a contractor from undisclosed or unknown site conditions that predate the contract, not something occurring thereafter. *See John McShain, Inc. v. United States*, 375 F.2d 829 (Ct. Cl. 1967) (addressing predecessor changed conditions clause); *Commercial Contractors Equipment*, 03-2 BCA ¶ 32,381 at 160,258.

Factor (4) calls for PBS&JC to show that the conditions it encountered were reasonably unforeseeable based upon all the information available at the time of its proposal.  Drilling superintendent Herzog opined that hitting groundwater on a drilling project and the use of casings were not unusual, but the amount of groundwater on the subject project was unusual (finding 35).  Mr. Eddins of Alliance, who was not an expert witness, opined that less than 30% to about 31% of the project borings indicated that water was present, fewer indicated sidewall instability, and a 22%-38% casing estimate would have been reasonable.  According to his 21 December 2010 letter in support of PBS&JC's claim, over 90% of the piers had to be cased due either to excessive groundwater intrusion, side-wall instability, or both.  Mr. Eddins noted at the hearing that, in a later Fort Hood project, the geotechnical report told contractors to assume that 100% of the piers would have to be cased. (Findings 10, 30-32, 34)

However, as we have found, there is no contemporaneous evidence of PBS&JC's pre-proposal assumptions concerning site conditions (finding 29).  According to expert McCleskey, PBS&JC's analysis of the boring logs as presented in its claim was not reasonable (findings 40, 41).  Finally, although it did not specify a number of drill holes to be cased, the GTR for the subject project alerted prospective contractors that "groundwater should be anticipated during pier construction" and that casing and pumps were required on-site prior to drilled pier construction (finding 8).  As Mr. Eddins acknowledged, if there is no direction concerning the number of piers to be cased, "you never know until you drill the hole" (finding 34).

Thus, PBS&JC has not met the requirements to establish a compensable differing site condition set forth in factors (1)-(4).  Factor (5) largely pertains to quantum, which we need not reach.

## DECISION

## DIFFERING SITE CONDITIONS CLAIM – ASBCA No. 57814

We deny the appeal.

19

FINDINGS OF FACT

We incorporate our findings in ASBCA No. 57814 to the extent relevant.

45. SOW § 3.1.1. prohibited exterior egress balconies (R4, tab 3 at 4 of 796), but § 6.2.1 stated: "Use of exterior wrap-around balcony is a deviation (approved by an existing waiver) from...[§] 3.1.1." (*id.* at 42 of 796). SOW §§ 3.2.3.6., 6.2.3., 6.5.1. and 6.11.8. also refer to balconies for the barracks (*id.* at 10, 50-51, 59 of 796). Under SOW §§ 3.1.3.1. and 3.1.3.1.(a) gross building area was measured to the outside face of exterior closure walls. It included one half the area of exterior covered areas such as balconies, breezeways, exterior corridors, and porches, which were measured from the face of the enclosure wall to the edge of the covered area. (57964 R4, tab 8 at 24)

46. RFP § 00 21 00 stated that "[s]pecial foundation work is required due to expansive soils found at Fort Hood" (R4, tab 3 at 5 of 106, ¶ 1.1.).

47. Under RFP § 00 73 00, Special Contract Requirements (SCR), the contractor warranted that its design would meet contract requirements (R4, tab 3 at 20 of 39, §§ 1.7(a), 1.8). SCR § 1.11, DEVIATING FROM THE ACCEPTED DESIGN (JUN 02), stated:

> (a) The Contractor shall obtain the approval of the Designer of Record [DOR] and the Government's concurrence for any Contractor proposed revision to the professionally stamped and sealed and Government reviewed and concurred design before proceeding with the revision.
>
> ....
>
> (c) Any revision to the design, which deviates from the contract requirements (i.e., the [RFP] and the accepted proposal), will require a modification, pursuant to the Changes clause, in addition to Government concurrence. The Government reserves the right to disapprove such a revision.

(R4, tab 3 at 22 of 39)

48. RFP § 01 33 16, Design After Award [DAR], § 1.2., stated that the contractor's DOR is responsible for contract compliance (R4, tab 3 at 97, 100 of 796). Section 3.5.3.1. stated:

The contractor's licensed geotechnical engineer shall prepare a final geotechnical evaluation report, to be submitted along with the first foundation design submittal. This information should be made available as early as possible during the over-the-shoulder progress review process. The geotechnical report shall summarize the subsurface conditions and provide recommendations for the design of...foundations.... The [report] shall recommend foundation systems to be used....

(R4, tab 3 at 108 of 796)

49. GTR § 5, "**Discussions**," stated:

Development of the final foundation and pavement designs are [sic] the responsibility of the Design-Build Contractor and shall be in compliance with the requirements established herein. However, the Design-Build Contractor shall provide to the Government engineering studies and design calculations that support the foundation and pavement design recommendations.... The Design-Build Contractor's foundation and pavement design recommendations shall be reviewed for technical adequacy and compliance with the criteria established in the [RFP], including this document. *Specific requirements for the Design-Build Contractor's foundation and pavement design analysis are provided in section 5.f.* [Emphasis added]

(R4, tab 4 at Bates 9)  The referenced § 5.f, "Requirements for the Design-Build Contractor's Foundation and Pavement Design Analysis," stated:

(1) Recommended Foundation System(s).
*A foundation system consisting of reinforced concrete straight-shaft drilled piers shall be utilized for [the project].* The Design-Build Contractor *shall design the straight-shaft drilled piers* in accordance with the requirements and design parameters provided in this report. [Emphasis added]

(R4, tab 4 at Bates 24)

21

50.  GTR § 5.b, "Foundation Design Considerations, Recommendations, and Requirements," stated:

> Based on the results of the geotechnical field investigation and laboratory testing program, and previous engineering experience at Fort Hood for similar buildings to those of the [project], the following recommendations, design parameters, and requirements are provided.  For the size and type of the proposed facility to be constructed at Fort Hood as part of this project, and the site-specific subsurface conditions present, a reinforced concrete straight-shaft drilled pier foundation system is typically considered best-suited foundation system [sic].  Reinforced concrete straight-shaft piers have proven to be a highly successful foundation system at Fort Hood.  *A shallow foundation system consisting of reinforced concrete continuous and/or spot spread footings is not considered to be a viable alternative due to the presence of highly expansive and compressible clay overburden soils and fill materials and to the depth of a competent bearing stratum beneath the overburden soils.  Therefore, shallow footing and foundations are not allowed.*  [Emphasis added]

(R4, tab 4 at Bates 11)

51.  GTR § 5.d(1) stated:

> Pavilions and *other* Small Support-type Structures.  Covered Pavilions and any *other* small (≤500 GSF) support-type structures (if applicable) can be supported on reinforced concrete slabs-on-grade....  It is further recommended that subgrade preparation...consist of providing a minimum of 36 inches of compacted nonexpansive fill below the soil-supported slab.  [Emphasis added]

(R4, tab 4 at Bates 15)

52.  The barracks are modular unit structures made of wood.  The exterior balconies are described as 2- or 3-floored (balconies on second and third floors, covered walkway underneath).  (Tr. 1/42-43, 2/206, 3/126, 4/31, 113; *see* R4, tab 35 at Bates 7, Sheet S-000; exs. A-001, A-002)  Shaddy Shafie, a lead structural engineer at Atkins, and a licensed structural engineer in several states and Puerto Rico, was the DOR (tr. 2/132-37).  Regarding GTR § 5.d(1) (finding 51), he acknowledged that the balconies were overall a

22

continuous system, over 500 gsf. However, for structural design loading criteria, he would break down the system into the balconies' columns. He thus deemed that the whole balcony system, regardless of the balconies' large size per floor, could be akin to a covered pavilion and a small support structure. (Tr. 2/207-08) Project superintendent Hartshorn proposed at the hearing that each column section involved about 300 square feet (tr. 3/150-51). Alliance's Mr. Rose considered the GTR's provision to be ambiguous as to whether the under 500 gsf limitation applied to covered pavilions (tr. 3/105). He stated that the balcony system could be construed to be a covered pavilion:

> Q     ...Is it your testimony that three floors of balconies and covered walkways, consisting of thousands of square feet of area constitute a covered pavilion?
>
> A     Again, I'm not a structural engineer, but I don't see why it couldn't be construed that way.

(Tr. 3/106)

53. PBS&JC's proposal stated that the site preparation, "along with the foundation work (drilled piers and grade beams)," was scheduled for completion no later than 259 days after the NTP (R4, tab 15, vol. 2, tab C, "Schedule Narratives" at 2). The parties agree that PBS&JC's proposal specified its intent to use a drilled pier foundation system beneath the barracks and did not indicate an intent to provide a design with exterior balconies (app. bp reply at 7, ¶¶ 36, 37).

54. The Corps notified PBS&JC that its proposal was deficient due to the lack of exterior balconies. PBS&JC stated that its interpretation had been based upon SOW, § 3.1.1., prohibiting exterior egress balconies (finding 45). It incorporated the balconies into its design and submitted its best and final offer, prior to contract award on 27 February 2009. (R4, tab 16 at Bates 3-7; app. bp reply at 8, ¶ 43; finding 1)

55. The Corps issued a Notice to Proceed for design work on 16 October 2009 (app. bp reply at 9, ¶¶ 45, 46). PBS&JC submitted an interim foundation design dated 30 November 2009. The parties agree that, under its proposal, the foundation was to be based upon drilled concrete piers, but its submittal advocated a "screw pile" foundation system and its drawings depicted the balconies and covered walkways supported on screw piles. (R4, tab 15B, Schedule Narratives at 2, tab 17 at 3-4; app. bp reply at 9, ¶ 48, at 10, ¶¶ 51-52) Steel pipe screw piles are a proprietary deep foundation system that is less expensive than drilled piers, which are another type of deep foundation system, poured with concrete and reinforcing steel (tr. 1/94, 2/138, 3/124, 4/128).

23

56. PBS&JC and the Corps had several exchanges about screw piles, which the Corps disallowed (e.g., R4, tab 19 at Bates 2, tab 22 at Bates 70, tab 23). A 9 December 2009 Kleinfelder report referred to the barracks as supported on screw piles and contained drawings depicting balconies and covered walkways supported by them (R4, tab 20 at 2-4, 46-47, tab 21). PBS&JC's "90% Foundation Submittal" of 27 April 2010 still had the barracks on screw piles, said to be based on a 26 April 2010 Kleinfelder report (R4, tab 24 at 3, § 2.0 at 41). However, attached specifications covered "DRILLED CONCRETE PIERS AND SHAFTS" (*id.* at 5-6, § 02 47 00) and the report stated:

### 3.2 Deep Foundation Recommendations

*Based on the subsurface conditions encountered at the test boring locations and the project information provided, we recommend the proposed buildings be supported on straight shaft drilled piers....* Design information for drilled piers is provided in the following sections. [Emphasis added]

(R4, tab 24 at 47) The parties agree that Kleinfelder's report did not reference or propose a shallow foundation system for any of the project work and its design drawings showed balconies and covered walkways supported by concrete piers (R4, tab 25, Sheet Nos. S-101 through S-115; app. bp reply at 13-14, ¶¶ 68-70).

57. PBS&JC submitted a final foundation design dated 2 June 2010, with Kleinfelder's revised 2 June 2010 Geotechnical Engineering Study. The parties agree that it mentioned, for the first time, the possibility of using spread footing foundations under certain conditions if the subgrade were prepared properly. (57964 R4, tab 9 at 61; app. bp reply at 15, ¶¶ 77-78) PBS&JC did not proffer DOR Shafie as an expert witness. According to him, the referenced subgrade preparation was required with either spread footings or drilled piers and he understood that it had been prepared per the GTR (tr. 2/155, 169, 178). He acknowledged that PBS&JC's previous submittals had shown the dormitory, including balconies, supported on screw piles or drilled piers, two types of deep foundation systems (tr. 2/203; *see similarly* tr. 3/68 (Rose)). There is no evidence that PBS&JC had raised with the Corps any alleged ambiguities in the above contract provisions that contained the words "recommended" or "recommendations" as well as "requirements" or concerning GTR § 5.d(1)'s shallow foundation exception for small support-type structures (*see* findings 49-51).

24

58. Kleinfelder's 2 June 2010 study stated:

### 3.1 Expansive Soil and [C]onsolidation Considerations

[A] PVR [Potential Vertical Rise] approaching 4 inches is expected. *The estimated vertical movement [of the soil] is greater than what most structural engineers consider acceptable for a shallow foundation system....* [Emphasis added]

### 3.2 Shallow Foundation Recommendations

We understand that spread footings will be used at select locations within the proposed structure. This decision depends on many factors including the magnitude of soil movement expected, the type of structure, the intended use of the structure, the construction methods available to stabilize the soils, and the owner's expectations of the completed structure's performance. However, one should always expect a grade supported foundation to undergo some differential vertical movements.

### 3.2.1 Building Pad Preparation

Provided herein are subgrade preparation recommendations for spread footings to modify the magnitude of soil movements beneath grade supported structures at this site to approximately one (1) inch....

### 3.2.2 Spread Footings

Shallow footings bearing on a properly prepared subgrade may be used to support the proposed structure....

(57964 R4, tab 9 at 67-69) However, the report's § 3.3, "**Deep Foundation Recommendations**" (*id.* at 69), repeated the drilled piers recommendation contained in Kleinfelder's 27 April 2010 report (finding 56). The parties agree that the drawings again showed balconies and covered walkways supported by concrete piers (R4, tab 29, Sheet Nos. S-101 through S-115; tr. 1/109-10, 2/135; app. bp reply at 16, ¶¶ 84-85), and that PBS&JC's finalized July 2010 drawings again depicted concrete drilled piers under the covered walkways and balconies (R4, tab 35; app. bp reply at 16, ¶ 83).

59. PBS&JC's Contract Drawing Sequence No. S-001 states:

> THE PROPOSED FOUNDATION DESIGN DEPICTED ON
> THE PLANS AND SECTIONS IS BASED ON THE FINAL
> UPDATED GEOTECH REPORT BY KLEINFELDER
> DATED 06/02/2010 *INDICATING REQUIREMENT OF A*
> *DEEP FOUNDATION SYSTEM.* THE DRAWINGS
> DEPICT GRAPHICALLY THE PROPOSED LOCATION
> OF DRILLED PIER. [Emphasis added]

(R4, tab 35, Soil Preparation and Foundations, Note 1)

60. On 2 July 2010 an ACO issued a Notice to Proceed, received by PBS&JC on 9 July 2010, for construction of the finalized foundation design (ex. G-1).

61. PBS&JC considered the lobby, entrance, mail kiosk, exterior walkways and balconies to be outside the main building. It sought to use spread footing foundations under them because it was behind schedule due to water and casing issues with the drilled piers, wanted to avoid them, and was looking to make up time and save costs, including potential liquidated damages. (Tr. 1/98-101, 3/195) By 14 October 2010 email to ACO Hammer, with the stated goal of improving the schedule, Paul Cook, PBS&JC's Director of Operations, submitted "Design Modification Request – RFI [Request for Information]-0119," seeking the Corps' "cursory review of our alternate foundation design intent" to remove drilled piers at the exterior balconies and replace them with spread footers, "with the understanding that our designers will provide complete details and design calculations under separate correspondence for review and approval" (57964 R4, tab 10 at Bates 149). He appended an internal PBS&JC RFI which inquired whether the change was viable or allowable. A PBS&JC structural engineer responded that it was viable. He included part of the 2 June 2010 Kleinfelder report (finding 57) and a sketch. (*Id.* at Bates 150; tr. 1/102-03) Mr. Cook told the ACO that one reason for the request was to speed up construction, but the ACO saw no benefit to the Corps in changing the contract (tr. 4/15, 41; Corps 12/19/12 resp. to APFF in 57964 (Corps bp resp.) at 28, ¶ 271). There is no evidence that PBS&JC provided "complete details and design calculations" by separate correspondence or otherwise.

62. The parties agree that the RFP had a separate design value for live loads for exterior walkways, balconies and stairs of 100 psf and that PBS&JC's structural engineers calculated that drilled piers under the balconies and walkways columns would carry a live load of 600 psf (Corps bp resp. at 7, ¶¶ 205, 206). DOR Shafie contended in a 24 January 2012 memorandum that the foundations in the construction documents for the walkway columns were a "significant overdesign" (57964, compl., ex. 5). However, he acknowledged at the hearing that his firm had done the design and that load-bearing

26

capacity was not the only reason to use a drilled pier foundation system (tr. 2/227-28). Mr. Heinchon conceded that the design could have been "overkill" regarding load bearing issues, but he noted that the main reason for using drilled concrete piers at Fort Hood was its expansive soil. Tied in to the main structure, balconies with spread footings would tend to move a lot more than the rest of the structure. (Tr. 4/111, 115) Mr. Rose also acknowledged that one consideration for using a drilled pier foundation system is that, if properly supported, it is less likely to move than a shallow supported foundation (tr. 3/52).

63. By 15 October 2010 email, Mr. Heinchon notified PBS&JC that the Corps' Geotechnical Section had responded that the GTR disallowed spread footings and required drilled concrete piers. By 22 October 2010 email to PBS&JC, he reiterated the disallowance and noted that PBS&JC's technical report had recommended straight shaft drilled piers. He stated that there was no need for PBS&JC to speak directly to the Geotechnical Section. (57964 R4, tabs 11, 12)

64. By letter to PBS&JC of 28 October 2010, ACO Hammer reiterated that spread footings were disallowed and he directed PBS&JC to continue with concrete piers per its approved foundation design. However, he stated that the Fort Worth District's geotechnical engineer would be at Fort Hood on 1 and 2 November 2010 and available to speak to PBS&JC's geotechnical engineer if it so wished. PBS&JC declined because it felt a structural issue was involved and it proceeded with the drilled piers, which were well underway by the time it received the ACO's letter. (R4, tab 30; tr. 1/106-07)

65. PBS&JC contends that it requested, and was denied, the opportunity to confer with a Corps structural engineer concerning spread footings. DOR Shafie testified:

> A    We submitted a letter and an RFI, requesting to use them at these locations, and requested to speak with a member of the Corps to discuss calculations and methods for making that system work, using spread foundations at the balconies and walkways.
>
> Q    Were you or anybody working for you on the structural team ever permitted or given the opportunity to speak with a Corps structural engineer or a Corps geotechnical engineer or otherwise provide the details and design calculations for the use of spread footers under the walkways and balconies?
>
> A    No.

(Tr. 2/141) During cross-examination ACO Hammer testified:

27

Q      You said a moment ago that you spoke to your geotech section. Correct?

A      Yes.

Q      You never spoke to a structural engineer, did you?

A      I don't believe so. No.

Q      And you never took the contractor up on the contractor's offer to have its structural engineer speak with your structural engineer. Isn't that right?

A      I don't – there was a lot of discussion where Paul Cook wanted – once he got our reply, what our reply was going to be or he got our letter, he wanted to meet with our geotech individuals. Okay. And he may have wanted to meet with our structural. We were going to entertain that. I think there were some emails back and forth.

Whether that meeting took place, I don't know....

....

Q      And you don't recall – and I can show it to you if you don't – there was an email said, We're not going to let you talk to our geotech section?

A      Well, I – there may have been that letter, and I don't deny that fact, but that didn't influence my decision.

(Tr. 4/39-41) As noted, the Corps did arrange for PBS&JC's geotechnical engineer to meet with its geotechnical engineer but PBS&JC declined (finding 64). We have not found any written request by PBS&JC to speak to a Corps structural engineer or any corroborating evidence that the Corps denied any such request, whether written or oral. Thus, we find that PBS&JC has not substantiated its contention that the Corps refused to allow it to confer with a Corps structural engineer concerning its spread footings request. Also, we find no evidence that the Corps acted in any way to hinder or delay PBS&JC or to deprive it of the value of the contract.

66. By a 5 November 2010 RFI to the Corps, PBS&JC sought to use a reinforced concrete slabs-on-grade foundation for the mail kiosk based upon the GTR's provision that structures less than 500 GSF could be so supported (finding 51). The Corps responded that this was for stand-alone structures; otherwise the area must use the same foundation system as the structure to which it was connected. The kiosk did not qualify because it was structurally connected to the building. (R4, tab 32; *see* tr. 1/112) Ultimately the Corps allowed spread footing foundations under the kiosk, a single story of qualifying small size. We are unpersuaded by project superintendent Hartshorn's calculation at the hearing that the kiosk's gsf was 625 square feet (tr. 3/156-159). Regardless, the Corps essentially required PBS&JC to make the kiosk a separate structure by adding beams that created a building joint which resulted in a discontinuity between the two structures, and by constructing an expansion joint at the roof's interface to allow separate movement between the buildings. PBS&JC was behind schedule and the Corps thought this would help. ACO Hammer allowed the change without any further design review other than by the project engineer, any contract modification, or any request for money back from PBS&JC. (Ex. G-2; tr. 1/112-13, 4/46, 72, 120, 122, 125)

67. Drilling continued into mid November 2010. A total of 584 pier holes were drilled. (R4, tab 7B at Bates 222; app. dsc resp. at 17, ¶ 43)

68. There was no contention that PBS&J's original drilled pier foundation design for the exterior balconies and walkways, which the Corps had approved, was defective. Although PBS&JC later contended that it was an over-design, it worked as intended and the Corps was satisfied with it. (Tr. 2/228-29, 4/118)

69. By letter of 11 February 2011, Mr. Williams notified the Corps that PBS&JC would seek an equitable adjustment under the contract's Changes clause (57964 R4, tab 8 at Bates 22). It submitted a certified $368,063 CDA claim dated 2 May 2011 to ACO Hammer, stating that its original proposal had deep foundations for the building consistent with the RFP but the Corps changed the building thereafter from internal corridors to an exterior balcony style building. PBS&JC alleged that, in its redesign, its engineering team "inadvertently added drilled piers to the exterior walkways" (*id.* at Bates 16), but the walkways were not an integral part of the building. They were exterior covered areas under SOW § 3.1.3.1.(a) (finding 45), and application of the GTR's small structures provision (finding 51) was appropriate. PBS&JC noted that its DOR approved changing from drilled piers to spread footings under balcony columns and alleged that this was consistent with Kleinfelder's 2 June 2010 report concerning spread footings (findings 57, 58) and with SCR § 1.11 concerning deviations from accepted designs (finding 47). PBS&JC contended that its DOR's re-evaluation distinguished building and exterior balcony foundations, for which spread footings were a viable option. It stated that this design modification was within its contractual rights but, upon the Corps' refusal to allow it, it had installed drilled piers at the balcony footings per its original design. It

sought its alleged resulting additional costs. (57964 R4, tab 8 at Bates 16-17) There is no evidentiary support for PBS&JC's claim that drilled piers under exterior walkways had been added to its design "inadvertently."

70. By final decision of 17 November 2011, the CO denied PBS&JC's claim and this timely appeal ensued (57964 R4, tabs 1, 2).

### Corps' Expert Evidence On Balcony Piers Claim

71. Zachary Gerich, a licensed professional engineer, held a bachelor's of science degree in civil engineering and a master's degree in structural engineering. At the time of the hearing he was a senior structural engineer in the Fort Worth District's structural design section. He was offered and admitted without objection as an expert in structural engineering. He submitted an expert report dated 18 July 2012. (R4, tab 34; tr. 4/48-51)

72. In Mr. Gerich's opinion, GTR § 5.d.(1) (finding 51) applied to structures under 500 gsf that were not part of a major structure—"more of a picnic-type structure, canopies, just anything that's not a major structure" (tr. 4/56). He described the balconies at issue as a three-story construction of steel framing with many methods of attachment to the building. He demonstrated that contract drawings showed that balconies and covered walkways were structurally integrated into the barracks through interconnected columns, beams, support angles, headed studs, and concrete decks. (Tr. 4/58-69)

73. Based upon Mr. Gerich's expert testimony, the contract drawings, and DOR Shafie's acknowledgement that that the balconies were a continuous system over 500 gsf, we find that the balconies and covered walkways were not under 500 gsf and did not qualify for the GTR § 5.d(1) exception to the contract requirement for a drilled concrete pier deep foundation system (findings 51, 52, 72, 76). We find the DOR's and Mr. Rose's propositions at the hearing that the balcony system could be akin to a covered pavilion and small support structure (finding 52) to be unreasonable and the Corps' interpretation to be the only reasonable one.

74. Mr. Gerich opined that use of drilled pier shafts is to minimize movement within poor soils, such as the heave and shrinkage of the clays in the local Texas area. Piers are the main type of foundation that will eliminate any excessive movement in a structure. (Tr. 4/70) Corps expert McCleskey stated that the reinforced concrete straight shaft drilled pier foundation system was a project requirement due to the facility's design requirements, the subsurface conditions, and his and the Fort Worth District's previous design and construction experience for similar structures. The advantages of a drilled pier foundation system are that it extends below the soil's upper active zone that would tend to produce heave, expansion, consolidation, or settlement with a shallow foundation

30

system, and it can be extended to a deeper, higher bearing strength formation better able to support the anticipated design loads for the facility. (Tr. 3/243-44)

75. Mr. Gerich similarly stated in his report that the GTR did not allow shallow foundations based upon the site's highly expansive and compressible clay soils. Potential heave in the upper 12' zone could be 2". Drilled shaft piers reduce potential swell and settlement to acceptable levels. Spread footings, however, will still move with the upper active soil zone. Movement can be reduced to tolerable levels only by extensive soil excavation and replacement with non-expansive fill. He also noted that Kleinfelder had recognized that there had to be extensive subgrade preparation, to minimize soil movement to about 1", if spread footings were used. However, in Mr. Gerich's expert opinion, given that the balconies had a 5'-4" span, even 1" of soil movement could affect their slope and function and would cause more structural issues, deterioration of the wood structures, and maintenance problems, in the future. (R4, tab 34 at 1-2)

76. Citing contract drawings, Mr. Gerich reported that the balconies/covered walkways were effectively integrated into the dormitory structure and that, given the anticipated soil heave and that the balcony/walkway system was not designed to move independently of the main structure, a common foundation system was required. In his opinion a structural designer should not mix different structural systems within a structure; use of different foundation types requires isolation joints at the intersection of the different systems; and the attachment of the balcony to the building structure would undergo severe deformations. The worst scenario would be differential settlement of the individual footings, which would damage the balcony and building connection and the connection between the exterior balcony columns. Mr. Gerich described in detail the potential problems with using spread footings instead of drilled piers for the balcony/walkways, including, *inter alia*, that the entire balcony structure would need to be isolated from the building, with enough clearance to prevent interference due to settlement and additional footings to support the balconies properly. (R4, tab 34 at 2-4) Mr. Gerich acknowledged at the hearing that it was possible, "[w]ith a complete redesign," to design a separate structure for the balconies that would have allowed differential movement between them and the building (tr. 4/82).

## DISCUSSION

PBS&JC contends that the Corps improperly denied its request to use shallow footings under the balconies and exterior walkways, which the contract allowed and was not a design deviation, as demonstrated by the Corps' acceptance of a shallow foundation at the mail kiosk. Alternatively, the contract was ambiguous as to whether the spread footers could be used and it should be construed against the Corps. PBS&JC apparently alleges latent ambiguities. Further, the Corps acted arbitrarily and capriciously and breached its duty of good faith and fair dealing when it failed to cooperate with PBS&JC

31

in its request to use spread footings and to administer the contract in a manner that did not hinder or delay performance or increase its cost.

The Corps responds that the contract was not ambiguous; it expressly required deep foundation systems and disallowed shallow footings for the balconies and exterior walkways; and the Corps was entitled to strict compliance. The Corps contends that PBS&JC's claimed interpretations were not reasonable and it did not rely upon them prior to contract award. Lastly, the Corps asserts that it administered the contract reasonably and did not breach its duty of good faith and fair dealing.

Regarding contract requirements for foundations, the GTR stated that the contractor's foundation and pavement designs were to comply with the RFP's and GTR's requirements and that specific requirements were in GTR § 5.f. That section, "Requirements for the Design-Build Contractor's Foundation and Pavement Design Analysis," stated under ¶ (1), "Recommended Foundation System(s)," that a reinforced concrete straight-shaft drilled pier foundation system "shall be utilized" and the contractor "shall design the straight-shaft drilled piers" in accordance with the GTR (finding 49). GTR § 5.b, "Foundation Design Considerations, Recommendations, and Requirements," stated that a "shallow foundation system" of "reinforced concrete continuous and/or spot spread footings" was "not considered to be a viable alternative" and "shallow footings" were "not allowed" (finding 50).

The GTR § 5.d(1) exception at issue applied only to covered pavilions and "any other small (≤500 GSF) support-type structures" (finding 51). It thus equated covered pavilions with "other" small support-type structures, all of which had to be equal or less than 500 gsf. We have found that the balconies and covered walkways were not under 500 gsf, did not qualify for the small structure exception, and that the DOR's and Mr. Rose's propositions at the hearing that the balcony system could be akin to a covered pavilion and small support structure were unreasonable (finding 73).

PBS&JC's actions confirm that it interpreted the RFP to require a deep foundation system when it submitted its accepted proposal and for a long time after contract award. After some initial confusion on its part as to whether exterior balconies were required, PBS&JC incorporated exterior balconies into its design prior to contract award (findings 53, 54). The accepted proposal design showed a foundation based upon drilled concrete piers—a deep foundation system (finding 55). PBS&JC alleged in its claim that, in its re-design, its engineers had "inadvertently added drilled piers to the exterior walkways," but there is no evidentiary support for the claim of inadvertence (finding 69). PBS&JC's interim design submittal of 30 November 2009 and designer Kleinfelder's 9 December 2009 report, both post-contract award, each depicted balconies and covered walkways supported on screw piles, another deep foundation system. Kleinfelder's 26 April 2010 report recommended a straight shaft drilled pier foundation system, did not propose a

shallow foundation system for any of the project work, and its design drawings showed balconies and covered walkways supported by concrete piers. (Findings 55-57)

Kleinfelder's 2 June 2010 geotechnical engineering study mentioned the possibility of spread footing foundations for the first time, stating it understood they would be used at select locations, and that they could be used on a proper subgrade. However, the report also stated that the soil's estimated vertical movement was "greater than what most structural engineers consider acceptable for a shallow foundation system," repeated the drilled piers recommendation in the 26 April 2010 report, and contained drawings showing balconies and covered walkways on concrete piers. (Finding 58) PBS&JC's finalized July 2010 drawings again depicted concrete drilled piers under the covered walkways and balconies (findings 58, 59). It was not until 14 October 2010 that PBS&JC submitted a "Design Modification Request" to remove drilled piers at the exterior balconies and replace them with spread footers (finding 61).

In sum, it is apparent that the contract did not allow the use of shallow spread footings under the exterior balconies and walkways, and that is how PBS&JC interpreted it for much of the contract performance period.

Regarding PBS&JC's alternative ambiguity argument, a contract provision is ambiguous only if it is susceptible of more than one different, reasonable, interpretation. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999); *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986). While we have found the Corps' interpretation of the exception allowing shallow foundations for small structures to be the only reasonable one (finding 73), even if we were to assume that there is another reasonable interpretation, PBS&JC cannot recover because any ambiguity would be patent and it failed timely to inquire about it. A patent ambiguity is one that would be apparent to a reasonable person in the claimant's position. In such a case, the contractor has a duty to inquire of the government about the provision's meaning before it submits its bid or proposal. The issue of whether a contractor's particular interpretation is reasonable is reached only if the ambiguity is not patent. *Lockheed Martin IR Imaging Systems, Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997); *Newsom v. United States*, 676 F.2d 647, 649 (Ct. Cl. 1982); *Dick Pacific/GHEMM, JV*, ASBCA Nos. 54743, 55255, 09-2 BCA ¶ 34,178 at 168,965.

PBS&JC knew, prior to its final proposal submission, and before contract award, that the contract included exterior balconies (finding 54). PBS&JC's alleged interpretations and ambiguities advanced at hearing or in briefing are strained. It alleges that there are ambiguities to the extent that any of the relevant contract provisions contained the words "recommended" or "recommendations" as well as "requirements" (*see* findings 49, 50), or that the 500 psf reference in the shallow foundation exception could be read not to apply to covered pavilions, or not to apply when individual column

33

sections were under 500 gsf (*see* findings 51, 52). However, any such alleged ambiguities were obvious. PBS&JC should have timely raised them and it did not (finding 57). Therefore, the alleged ambiguities are resolved against it. *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355 (Fed. Cir. 2002). Because the ambiguities alleged by PBS&JC were patent, we do not reach any latent ambiguity arguments.

With respect to PBS&JC's contention that the Corps acted arbitrarily and capriciously in denying its request to use spread footings under the exterior balconies and covered walkways, the Corps' actions were sanctioned under the contract. It required that the contractor obtain the government's concurrence for any proposed revision to the approved design before proceeding, and the government reserved the right to disapprove any design revision that deviated from contract requirements. (Finding 47)

PBS&JC alleges that the spread footings change was not a deviation from contract requirements and notes that the Corps allowed spread footing foundations under the mail kiosk, without any contract modification. However, the mail kiosk was a single story of qualifying small size, which PBS&JC in essence made a separate structure. (Finding 66) Although Mr. Gerich acknowledged that it was possible to design a separate structure for the balconies that would have allowed differential movement between them and the building, this would have required a complete redesign (finding 76). Moreover, while the requirement for drilled piers under the balconies and walkways could have been more than was necessary for load-bearing purposes, the main reason for using drilled concrete piers at Fort Hood was its expansive soils. Balconies with spread footings would tend to move a lot more than the rest of the structure to which they were tied. Mr. Rose of Kleinfelder acknowledged that a drilled pier foundation system is less likely to move than a shallow supported foundation. Expert Mr. Gerich confirmed that drilled piers were used to minimize movement within poor soils, such as those in the local Texas area, and that spread footings would move. (Findings 62, 74, 75)

The Corps was entitled to compliance with its specifications and the approved design, and saw no benefit to it in changing. It was not obligated to approve a change, particularly such a significant one, advanced by PBS&JC for the first time relatively late in the project. (Findings 57, 61, 68) Thus, the Corps did not act arbitrarily and capriciously in denying PBS&JC's request to use spread footings under the balconies and covered walkways.

Somewhat intertwined with its contentions that the Corps acted arbitrarily and capriciously, PBS&JC further alleges that the Corps breached its duty of good faith and fair dealing and its duty not to hinder or delay contract performance by failing to cooperate with it in its request to use spread footings. PBS&JC particularly stresses the Corps' alleged refusal to allow it to confer with a Corps structural engineer.

34

The duties to cooperate and not to hinder have been treated as aspects of the duty of good faith and fair dealing. *Metcalf Construction Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). Government officials are presumed to act in good faith and it takes clear and convincing evidence to prove otherwise. *Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368-69 (Fed. Cir. 2012). In *Metcalf*, the court of appeals discussed governmental breach of the duty of good faith and fair dealing in terms of acts or omissions that, while not expressly proscribed by the contract, are inconsistent with its purpose and deprive the other party of the contract's contemplated value. 742 F.3d at 991; *accord Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014). The court recently summarized:

> Every contract implicitly contains a covenant of good faith and fair dealing, keyed to the obligations and opportunities established in the contract. The covenant imposes on each party a "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."

*Lakeshore Engineering Services, Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014) (citations omitted).

PBS&JC stated in its 14 October 2010 request to change its approved design in order to use shallow spread footings under the exterior walkways and balconies, rather than deep foundation concrete drilled piers, that it would provide complete details and design calculations. There is no evidence that it did so. (Finding 61) The Corps notified PBS&JC that its Geotechnical Section had disallowed the change. While, at first, it stated that there was no need for PBS&JC to speak directly to the Section, the Corps later arranged for a meeting if PBS&JC so wished. PBS&JC declined because it felt a structural issue was involved and it was well underway with the drilled piers at the time. (Findings 63, 64) We found that PBS&JC did not substantiate its contention that the Corps refused to allow it to confer with a structural engineer concerning its spread footings request and we found no evidence that the Corps acted in any way to hinder or delay PBS&JC or to deprive it of the value of the contract (finding 65).

In sum, there is no evidence that the Corps' actions were in any respect tantamount to a breach of its duty of good faith and fair dealing.

35

## DECISION

### BALCONY PIERS CLAIM – ASBCA No. 57964

We deny the appeal.

### CONCLUSION

ASBCA Nos. 57814 and 57964 are denied.

Dated: 25 July 2014

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57814, 57964, Appeals of PBS&J Constructors, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals